# John Church Company *v.* M. W. Guernsey and H. D. Guernsey, Appellants.

*Principal and agent—Account—Consignment—Evidence.*

On a bill in equity for an account of the proceeds of the sale of certain pianos alleged by the plaintiffs to have been consigned to the defendants, and alleged by the defendants to have been sold to them, the Supreme Court will not reverse a finding of the lower court based upon sufficient evidence, though contradicted, that the pianos were consigned and not sold to the defendants.

Argued Feb. 20, 1899. Appeal, No. 105, Jan. T., 1899, by defendants, from decree of C. P. Lackawanna Co., May T., 1896, No. 4, on bill in equity. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and DEAN, JJ. Affirmed.

Bill in equity for an account.

It was not disputed by the defendants that the written agreement between them and the plaintiff dated May 9, 1890, was that pianos were to be consigned to them by plaintiff to be sold or leased.

From the bill, answer and evidence GUNSTER, J., found the following facts:

1. The John Church Company is a corporation of the state of Ohio, with its principal place of business in the city of Cincinnati, Ohio. The defendant, M. W. Guernsey, is a citizen of the city of Scranton, in the state of Pennsylvania. The defendant, Harmon D. Guernsey, was formerly a citizen of the city of Scranton.

2. The plaintiff is a dealer in pianos and other musical instruments, and sells, consigns and leases, its pianos and other goods extensively throughout the United States.

3. On or about May 9, 1890, one N. B. Pratt, representing the plaintiff, called upon the defendants at their place of business in Scranton, Pa., for the purpose of doing business with them. After some negotiations he submitted to them a form of an agreement partly written and partly printed. Guernsey Brothers signed the same in duplicate and thereupon Mr. Pratt sent both copies to the plaintiff at Cincinnati for approval and

execution. On receipt of the same Mr. Frank A. Lee, the
president of the company, signed one of the duplicate copies on
behalf of the company and returned it by mail to the defend-
ants; the other copy he retained for the company.

4. Before signing said instrument the defendants objected
to the manner in which the agreement required the business
to be done, and told Mr. Pratt that the matter would have to
be differently arranged; that they wanted to do business in
their own name and in their own way. They now allege that
subsequent to the signing of the agreement the same was varied
by parol agreement and the conduct of the parties; that they
purchased pianos which they received from the plaintiff to be
paid for in accordance with the written agreement as modified
by subsequent agreements, increasing the monthly payments
in some instances and in others by sending their bank paper
for the amount of the orders given and pianos shipped, and
they agreed to lease pianos in their own name as owners and
did so with the knowledge and consent of the plaintiff. Within
about thirty days after said agreement was signed Mr. Pratt
again called upon the defendants and was informed by them
that unless they could do the business in their own name that
they would not sell plaintiff's pianos and that they wanted the
privilege of making sales and leases in their own name and of
settling for the pianos consigned to them by cash or their own
notes or by transferring to the plaintiff the leases which they
took from their customers. Mr. Pratt communicated this re-
quest to the plaintiff and thereupon the plaintiff agreed that
instead of using the form of lease to be furnished by the plain-
tiff and making out such lease in the name of the plaintiff, that
the defendants might use their own form of lease and make
the same out in their own name, upon condition that they
transferred such lease so taken to the plaintiff, and the plaintiff
agreed to take such transfer or assignment.

5. Soon after said agreement of May 9, 1890, had been signed
by both parties, the plaintiff began shipping pianos to the de-
fendants, and from time to time when requested shipped pianos
to the defendants, numbering 219 altogether. The plaintiff
alleges that all these pianos were consigned to the defendants
under and in pursuance of the said agreement and upon the
terms and conditions therein mentioned, while the defendants

allege that many, if not all, of these pianos were purchased outright by them, and that the relation between them and the plaintiff is that of debtor and creditor and not of consignor and consignee. There is no evidence in the case outside of the testimony of the defendants themselves that they purchased any of the pianos outright. M. W. Guernsey, one of the defendants, testified in regard to the conversation with Mr. Pratt as follows: "Q. Now, Mr. Guernsey, you may give the conversation? A. Mr. Pratt returned in about thirty days. Mr. Pratt and my brother and myself talked it over together. We objected to doing business for anybody else but ourselves. Q. Give the conversation? A. We said that we would not do business for the John Church Company, and unless some arrangement could be made whereby the business was our business that they could have their pianos back and we would not sell any; that we wanted to make our own leases and our own terms, and we wanted the privilege of settling for the pianos as we chose, either by cash or our own personal note or by lease. Mr. Pratt said he had conferred with the company and that that would be all right. We went on then and did business."

On cross-examination he testified: "Q. Mr. Guernsey, that was all that was said at that time, was it? A. No, I don't think it was all. There probably were other things. Q. Do you remember anything else? A. I remember Mr. Pratt said: 'How do you do' when he came in. Q. Do you remember anything else that was said there that day with Mr. Pratt? A. I don't remember anything special now. Q. There was more talk, wasn't there? A. I don't think there was a great deal, only that he wanted we should take Wilkes-Barre and take Bacon's business. Q. Bacon's business was an unsettled business? A. Yes, sir; and collect Bacon's accounts. He talked that the company had trouble with Bacon, etc. Q. Your first agreement was that you could sell for cash, that you could lease, or take lien paper, wasn't it? A. Yes, sir. Q. So this matter of selling for cash or taking lien paper wasn't modified by that talk, was it? A. No, sir. Q. So it didn't modify anything in that regard? A. No, sir; I think not. Q. All it does modify is that you could settle as you pleased? A. And do business for ourselves instead of the John Church Company. Q. That was agreed in the first place, that you could take the

leases in your own name and assign them over to the John Church Company? A. Nothing said about that at the time of the making of the contract. Q. You did do that? A. No, sir; we had given no leases at the time of this talk; we refused to do any business until we could do that. Q. After that time, when you took a lease you turned it over to the John Church Company? A. Yes, sir; when we saw fit. Q. Didn't you do it for the first part of your term entirely? A. No, sir. Q. Did you not make reports? A. Yes, sir. Q. When you collected did you not report as collected on such and such a piano? A. Yes, sir. Q. And that was in accordance with your written agreement? A. Yes, sir. Q. How many times did you go to Cincinnati after this contract was signed by you and before this suit was started? A. I think three times."

H. D. Guernsey, the other defendant, testified in regard to the conversation with Mr. Pratt, as follows: " Q. State what the conversation was between you and Mr. Pratt at that time. A. Mr. Pratt came again, I should judge about thirty days after that, about that time, as near as I can remember, and said that he had seen the company since his first call or since his other visit, and that they were willing that a certain objection that I raised with regard to the contract should be lived up to; that the contract was merely a guarantee to the company of the payment of our accounts, merely as a collateral; that we could do the business in our own name, use our own leases, make our own collections, and those were the serious points I objected to in the contract. Q. If it was stated there how you were to purchase these pianos, just state what was said. A. That the pianos should be shipped us as per arrangement. We could pay for them either by our own notes, by cash or by turning over leases which we took from our customers, by simply transferring the leases to the company. Q. Was anything said how the assignment was to be put upon the leases; if so state what was said. A. I don't remember what was said, anything more than that we assign. I think they were all assigned in the same way, but we were to assign them in a certain form to the John Church Company."

On cross-examination he testified as follows: "Q. Mr. Pratt said to you, did he, in substance, that you could sell pianos and organs for cash? A. That we could pay for them in cash;

nothing said about the selling that I know of.   Q. Did he say anything about that they could be on lien paper and part cash? A. Yes, sir.   Q. Did he say anything about to responsible parties on lien paper only, without cash?   A. I don't remember as to the responsibility so much because the piano covered the responsibility.   Q. He did speak of your leasing them? A. Yes, sir.   Q. And your assigning the leases over to the John Church Company?   A. Yes, sir.   Q. Talked something about the form of the assignment?   A. Yes, sir."

Other testimony was given by the defendants bearing upon this question, but it is largely argumentative.   On the other hand, in addition to and outside of the testimony of Mr. Lee, the president of the plaintiff company, the evidence is strong and conclusive that the pianos in question were consigned to the defendants under and in pursuance of the agreement of May 9, 1890.   It is proper to refer to some of this evidence. It is an undisputed fact in the case that from time to time as the plaintiff shipped pianos to the defendants, it sent them consignment invoices for the pianos shipped, giving the name, number, style and price of each piano shipped.   These invoices were produced at the trial by the defendants on notice.   They are 125 in number, are all alike in form, and on their face expressly state that Guernsey Brothers had received the pianos therein specified "on consignment."   The following is an exact copy of the first of said invoices:

"GENERAL FACTORS EVERETT PIANO CO., BOSTON.

"CINCINNATI, May 19, 1890.

"MESSRS. GUERNSEY BROS.,
    "Scranton, Pa.

"Received from The John Church Company, wholesale and retail dealers in pianos and organs, No. 74 W. Fourth street, on consignment,

| "Instrument. | Style. | Number. | Price. |
|---|---|---|---|
| "3 Everett pianos | 10 Eb. | 9228 | $200.00 |
| | 12 Eb. | 9213 | 210.00 |
| | 13 Eb. | 9223 | 220.00 |

"$630.00 "

All the others are similar in form.

With each of said invoices was forwarded a consignment receipt to be signed by Guernsey Brothers and returned to the plaintiff. Each receipt was for the piano therein mentioned " on consignment," and " upon the terms of the contract entered into with the said John Church Company." Many of these receipts were signed by Guernsey Brothers and returned to the plaintiff. Some they neglected to return. The following is a copy of the consignment receipt sent by the plaintiff to the defendants and acknowledged and returned by the defendants to the plaintiff:

" Received from The John Church Company on consignment, one . . . . . . piano, style . . . . , number . . . . . , valued at . . . . . dollars, upon the terms of the contract entered into with the said John Church Company, dated . . . . . . . . . . . . . . 189 . . . "

Item eleven of the agreement of May 9, 1890, provides as follows, to wit: " On or before the fifth day of each month said party of the second part shall send The John Church Company, upon the blanks furnished them by the said company for that purpose, and in conformity therewith, reports of all unsold pianos and organs in their possession." From month to month the plaintiff sent to the defendants statements of instruments sent them on consignment for which no returns had been received, and requested them to make return for as many as possible before the fifth of the month, and to fill out the blank line after each unsold instrument, requesting them to state the name and address of person who held the instrument at the date which instrument was unsold, and for which no settlement had been made by the customer, the prospect of sale, etc. The defendants made at least seventy-two of these reports, stating whether they still had the instrument in stock or had bought it themselves or had sold it to some one else, or where it was.

Item eight of the agreement of May 9, 1890, provides that " should it become necessary for any cause to cancel any of said notes, mortgages or leases, said party of the second part shall, when so requested by the party of the first part, take up any such piano or organ secured by such lien paper, which piano or organ shall again be placed on consignment with the party of the second part at original price plus interest, as provided for in item four, less what amounts may have been received on such

VOL. CXC—19

piano or organ by parties of the first part." The defendants leased to different parties the great majority of the pianos shipped to them, and as a rule assigned these leases to the plaintiff. Each of these leases so transferred called for more money than was due the plaintiff for the piano therein mentioned. Whenever it became necessary to use any of these leases for the purpose of collection or recovering or repossessing the pianos, they were returned to Guernsey Brothers. When Guernsey Brothers reported having repossessed a certain piano it was again consigned to them by the plaintiff at the original price, plus interest, less what amount had been received thereon by the John Church Company. A number of pianos were reported by the defendants to have been repossessed by them. Every one so reported was immediately reconsigned to the defendants by the plaintiff according to item eight of the agreement. The reconsignments were all made in substantially the same form. The following is a copy of one of them:

"THE JOHN CHURCH CO. GENERAL FACTORS. THE
"EVERETT PIANO CO., BOSTON.

"CINCINNATI, July 13, 1895.

"MESSRS. GUERNSEY BROTHERS,

"Scranton Pa.

"Having received notice through yours of 6th inst that you have repossessed Everett 16906 from John Doran, we reconsign it to you at $190.57, as follows:

| | | |
|---|---:|---:|
| Original invoice, October 19, 1894, | $188.40 | |
| Interest from October 19, 1894, to date July 13, 1895, at 6 per cent., | 7.50— | $195.90 |
| less | | |
| Payments received by us and applied on this contract, | 5.00 | |
| Interest on above payments to date | .33— | 5.33 |
| "Reconsigned as above, | | $190.57 |

"The sum of $1.20 passed originally to your conditional credit on account lien paper of John Doran, we have today charged back to same account.

"Yours very truly,

"THE JOHN CHURCH COMPANY."

The correspondence between the parties also indicates that the business between them was under and in pursuance of the agreement of May 9, 1890.  On June 9, 1890, the defendants wrote to plaintiff as follows : " We would like it if you would modify our contract in this way that we can pay you $10 down and $10 per month on pianos until paid for as we are many times compelled to take $10 down and $10 per month, and when we begin to pay for a piano we will pay for it, and if our customer does not pay we will sell it to some one who will.   Will try and report some sales next month.   P. S.  Can we sell in Elmira, N. Y. until you make some other disposition of that territory ? "

To which plaintiff replied : " We have no objection at the present to your making sales of our pianos in Elmira, N. Y., but expect you would withdraw from that locality as soon as we establish agency in Elmira.   Will allow you to make sales of our pianos at not less than $10 down and $10 monthly, provided we receive all of first cash payments where sales are made on these terms."

On February 12, 1890, the defendants wrote plaintiff as follows, among other things : " In regard to terms of contract you are correct, namely, that we were to pay one-half of all cash received as first payment.   As we understood it however our contract was modified by your letter of June 11, 1890, in which you agreed to accept $10 down and $10 per month until paid for.   We made this request in our letter to you of June 9th."

In the same letter further on they say : " Regarding our financial standing will say we inventory our goods at cost price if in perfect order, if damaged we discount them the amount of the damage.   We count your pianos in stock as assets at invoice price and count the amount owing you for same in liability ; whereas technically they are consigned, they are practically sold.   Our lease account is figured at face value."

On January 23, 1892, the plaintiff wrote the defendants as follows : " Under no condition do we want for consigned goods settlement other than in cash or satisfactory lien paper."

On January 5, 1894, the plaintiff wrote the defendants as follows : " We notice that the J. W. Guernsey note is not lien and this is not according to the rules of our business nor is it according to our contract with you, but in this case we will accept the same."

The agreement of May 9, 1890, provides that the defendants shall offer the pianos consigned to them only in certain territory therein mentioned. From time to time the defendants requested permission to offer plaintiff's pianos in other territory, and the plaintiff gave its consent in a number of cases to the defendants so doing.

Again the defendants made collections on the leases made by them, and from time to time reported some of these collections, remitting money and stating on what instruments the payments should be applied. In 1894, Mr. Frank Butler, representing the plaintiff company, came to Scranton, and upon an examination of the defendants' books found a shortage in their account with the plaintiff. This shortage he testified covered, not only money which the defendants had collected on the assigned leases, but also instruments which had been consigned to the defendants and which the defendants had disposed of. It is an undisputed fact in the case that the defendants in some way or other repossessed a number of instruments which they had leased and for which they had assigned leases to the plaintiff. Some of these repossessions were not reported, but the defendants, notwithstanding, again sold or leased such repossessed instruments without notifying the plaintiff, although the plaintiff held the assignment of the original leases. The defendants did not deny that there was a shortage when their books were examined by Mr. Butler, but disputed the amount. At the same time they sent to the plaintiff at Cincinnati assignments of some six or eight leases which had not been reported, but which Mr. Butler claimed belonged to the company. In April, 1895, although disputing the plaintiff's right to the same, they assigned some eight or nine more leases to the plaintiff. A full examination of all the evidence bearing on the question now under consideration satisfies me, and I find as a fact, that all the pianos shipped by plaintiff to the defendants were consigned to them under and in pursuance of the agreement of May 9, 1890, and upon the terms and conditions therein mentioned; and that the plaintiff agreed that the defendants might use their own form of lease and make out the same in their own name on condition that they assign such leases to the plaintiff, and that the plaintiff agree to take such assignment of such leases.

6. The defendants claimed the privilege of making collections

on all pianos leased by them. The plaintiff construed the agreement of May 9, 1890, as giving the defendants that privilege so long as they faithfully complied with the terms of the instrument, and accounted for the pianos consigned and the moneys collected. As a matter of fact the defendants made collections on the leases and from time to time reported a portion of them and remitted to the plaintiff a portion of the amounts as reported as collected by them. About October, 1894, the plaintiff discovered that the defendants had made sales and leases of some of the pianos consigned by it to the defendants, without reporting the same, and had made collections on said sales and leases, as well as on other leases, without reporting the same or accounting for or remitting the amount of such collections, and that the shortage in their account was about $4,000. As already stated, the defendants denied the amount of the shortage, but agreed to make it good by paying the plaintiff $800 per month until it was all paid. For several months they sent sums in varying amounts, but never enough to cover the shortage. Other differences arose between the parties and on February 23, 1895, they wrote the plaintiff as follows: "Our lawyers advise us to send in no more leases while you hold so much of our paper, but we will report everything correctly and you can get all the transactions from our report or any special points you desire light on we will cheerfully give it."

Later on they refused to report as to what had been done with some of the pianos or where they were. They claimed that they had bought them and had the right to do as they pleased with them and refused to assign the leases or to pay over collections on such of them as they had leased. On September 1, 1895, the plaintiff notified the defendants that they should no longer collect moneys upon said pianos leased, and that the rents then due or thereafter to become due should be paid directly to the plaintiff or its attorney. At the same time notice was given to the said lessees in said leases that no more money should be paid on the same to Guernsey Brothers, but the rents then due or thereafter to become due should be paid directly to the John Church Company or its duly authorized attorney. Thereupon the plaintiff itself undertook to collect the moneys due and coming due on the leases of which it held assignments. The de-

fendants however, notwithstanding the notice given by the plaintiff, insisted that they had the right to make collections on said leases and continued to collect, and did collect large sums thereon without remitting the same to the plaintiff.

The court having found that the pianos had been consigned to the defendants proceeded to state an account, and found that the defendants owed the plaintiff the sum of $9,443.99. A decree for that amount was accordingly entered against the defendants.

*Error assigned* among others was the decree of the court.

*Samuel B. Price*, with him *Charles H. Welles*, for appellants.

*W. W. Watson*, with him *W. S. Diehl*, for appellee.

PER CURIAM, March 13, 1899 :

It would serve no useful purpose to discuss the questions involved in the eighteen specifications of error before us. A careful consideration of the evidence, so far as it has any bearing on either of them, has satisfied us that there is no substantial error in any of the learned trial judge's findings of fact, or in the conclusions drawn by him therefrom. We are not convinced that there is any error in the record that requires either reversal or modification of the decree.

Decree affirmed and appeal dismissed at appellants' costs.